**Laura Anne ROBINSON, Respondent,**

v.

**Jeremy Lee ROBINSON, Appellant.**

**No. WD 72002.**

Missouri Court of Appeals,
Western District.

April 12, 2011.

was nineteen months old at the time of the dissolution trial.

After Sophia's birth, Jeremy was not at home very much. He usually got home after 8:00 p.m. on weeknights and was often gone on the weekends. By May 2008 (perhaps earlier), within two months after the baby's birth, Jeremy had taken up with a girlfriend, who also was married with three children of her own.

Laura and Jeremy separated in January 2009 shortly after Laura learned of Jeremy's extra-marital relationship. Laura filed her petition for dissolution a month later. Jeremy began living part-time with his girlfriend in Overland Park, Kansas, and part-time at his parents' home in Independence, Missouri. Laura continued to live in Blue Springs.

The parenting plan in effect during the separation called for Laura to have Sophia every Monday and Wednesday and for Jeremy to have her on Tuesdays and Thursdays. They alternated on the weekends. Jeremy exercised his visitation with Sophia at his parents' home in Independence, where he (and sometimes his girlfriend) would stay while Sophia was there.

Although Jeremy had some layoffs from his job in 2009, his income that year was over $30,000. Jeremy paid nothing toward the support of his daughter throughout the separation.

Jeremy's parents had been providing the daytime daycare for Sophia since her birth. For the first three months after the parties separated, Laura continued to take Sophia to Jeremy's parents every day for daycare. This caused her to do a considerable amount of driving. Before work in the mornings, she drove Sophia from Blue Springs to Independence and then drove from Independence to her job in Lee's Summit, an hour's worth of driving. She made the same trip in the evenings. Lau-

Allen S. Russell, Kansas City, MO, for appellant.

Susan E. Long and Alison K. Blessing, Liberty, MO, for respondent.

Before Division One: THOMAS H. NEWTON, P.J., JAMES M. SMART, JR., and JOSEPH M. ELLIS, JJ.

JAMES M. SMART, JR., Judge.

Jeremy Robinson appeals the trial court's judgment in his marital dissolution case. He contends that the court's decision to allow Laura Robinson to relocate with the parties' minor child was not supported in the evidence. The judgment is affirmed.

## Facts

Laura and Jeremy Robinson were married in September 2006. They resided in a house that Laura owned in Blue Springs, Missouri. Jeremy worked as a carpenter and Laura was employed by Shelter Insurance in Lee's Summit. Their daughter, Sophia, was born in March of 2008. She

ra seldom saw Jeremy or his vehicle at his parents' house when she left Sophia there in the mornings or picked her up in the evenings.

Laura learned that her neighbor, a stay-at-home mom, was willing to provide daycare for Sophia for about $25 per day. In May 2009, Laura made arrangements with the neighbor to care for Sophia three days a week. Laura decided to take Sophia to Jeremy's parents the other two days (which coincided with the temporary parenting plan in effect at the time). Unfortunately, Jeremy's parents were given no notice of the change in the daycare arrangement until one morning when Laura simply failed to show up with Sophia.[1]

The parties were agreed that the court should award joint legal and physical custody, with Laura's address as the principal mailing address. After the divorce had been pending for eight months, on October 8th, Laura amended her petition to request relocation to Columbia where her parents live and where she has other extended family.

At trial, the evidence Laura presented with regard to her relocation request did not directly address how the move would be in Sophia's best interest. Rather, it was primarily about how the move would benefit Laura from the standpoint of family support, greater job potential, and so on. The evidence showed that Laura has taken Sophia to Columbia to see her parents every other weekend since Sophia's birth and that Laura's parents have been very involved in Laura's and Sophia's lives. They also have provided financial support, saving Laura's house from foreclosure at one point. Laura told the court that the move to Columbia would allow her to have even more support from her family. Lau-

ra planned that she and Sophia would live with her family until she could acquire a place of her own. Her parents would not be providing Sophia's daycare as Jeremy's parents had done, because, unlike Jeremy's parents, Laura's parents were still employed. Laura's mother works for Shelter Insurance. Laura's father is no longer engaged in employment on a full-time basis, but has some part-time, flexible employment. Laura testified that there would be more opportunity for promotion on her job if she were to transfer to the Columbia office, because the company's headquarters are in Columbia. Jeremy does not dispute that the office in Lee's Summit offers less opportunity for advancement.

Both of Jeremy's parents and his sister testified at trial, as did Laura's father. Jeremy's parents testified about their close relationship with Sophia and stated their belief that the proposed relocation would negatively impact the closeness of that relationship.

The trial court granted Laura's request to relocate, finding that it was made in good faith and would be in the best interest of Sophia. The court awarded joint legal and joint physical custody and designated Laura's residence as the child's address for mailing and educational purposes. The court set forth a parenting plan that gave Jeremy certain periods of actual custody, which the court found gave him as much overnight parenting time as he currently had. The plan provided for the parties to share the transportation costs to exchange Sophia by meeting halfway at Sweet Springs.

Jeremy appeals.

1. Laura's attorney attempted to notify Jeremy of the new arrangement by letter, but Jeremy's attorney was on vacation at the time. As a result, Jeremy and his parents received no advance notification.

## Discussion

Jeremy contends that the trial court erred in its decision to allow Laura to relocate to Columbia with Sophia. He claims that the decision was not supported by substantial and competent evidence, in that Laura offered no evidence that such a move would be in the best interest of Sophia, and that the effect of the decision is to divest him of frequent, continuing, and meaningful contact with the child.

### Standard of Review

■ "Our review of the trial court's judgment denying or granting a motion to relocate a minor child is governed by the standard in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976)." *Mantonya v. Mantonya*, 311 S.W.3d 392, 395 (Mo.App.2010). Pursuant to *Murphy*, the trial court's decision must be supported by substantial evidence. 536 S.W.2d at 32. Substantial evidence means "competent evidence from which the trial court could reasonably decide the case." *Lowery v. Lowery*, 287 S.W.3d 693, 698 (Mo.App.2009). "Because the trial court is in the best position to weigh the evidence and render a judgment based on the evidence, the judgment is to be affirmed under any reasonable theory supported by the evidence." *Love v. Love*, 75 S.W.3d 747, 754 (Mo.App.2002). We start with the presumption that the trial court's decision was motivated by the child's best interests. *Lowery*, 287 S.W.3d at 694. We will affirm "unless we are firmly convinced that the child's welfare requires some other disposition." *Id.*

### Analysis

Relocation of a minor child is governed by section 452.377.[2] *Mantonya*, 311 S.W.3d at 395. In 1998, the General Assembly amended section 452.377 to include the standard by which courts would determine whether the custodial parent should be allowed to relocate a child. *See Stowe v. Spence*, 41 S.W.3d 468, 469 (Mo. banc 2001). Subsection .9 now provides that "the party seeking to relocate shall have the burden of proving that the proposed relocation is made in good faith and is in the best interest of the child." Section 452.377.9. Section 452.377.9 is applicable to *post-dissolution* relocation requests. The statute places the burden of proof on the party seeking relocation and similarly requires a showing that the request is made in good faith and is in the best interest of the child. *Id.* The legislature did not specify that, in determining the best interest of the child, the court is to focus primarily on the factors mentioned in section 452.375. At the same time, the legislature did not specify that the court could not consider whatever factors mentioned in 452.375 are logically pertinent. We assume, therefore, that the General Assembly intended to allow flexibility to the trial court to consider all relevant factors. Sometimes the custody decision may almost entirely overlap with the relocation decision, because of the circumstances of the case. There will be other cases in which the custody decision in favor of a party does not necessarily mean that relocation will be granted to that party. Section 452.375 anticipates that a party in a dissolution case may desire to seek relocation (and such desire is a factor to consider in the custody award and parenting plan), but that does not mean, of course, that granting relocation will always be automatic if the custody award, or the parenting plan, tends to be in favor of the party seeking relocation.

---

**2.** All statutory references are to the Revised Statutes of Missouri 2000, as updated by the 2010 Cumulative Supplement.

Prior to the 1998 amendment in 452.377.9, the courts relied upon a four-part test found in *Michel v. Michel,* 834 S.W.2d 773, 777 (Mo.App.1992), to decide whether to grant a parent's request to relocate. In 2001, the Missouri Supreme Court declared in *Stowe* that the four-part *Michel* test is no longer to be applied. 41 S.W.3d at 469–70. Rather, the trial court is to be guided by all relevant considerations consistent with the best interests of the child in deciding whether the relocation is requested in good faith and would be in the best interest of the child. *See id.*; *see also, e.g., Romanetto v. Weirich,* 48 S.W.3d 642, 647 (Mo.App.2001) (sufficient evidence supported finding that relocation was in child's best interest based on a variety of factors specific to that case). It makes sense that the court is not *restricted* in its best interest analysis to the four-part *Michel* test nor to the best-interest factors mentioned in section 452.375 as to change of custody.

Section 452.375 sets forth some of the factors a court is to consider in determining what would be in the best interest of the child with regard to custody. Among the factors listed in section 452.375.2 are these, which, according to common sense, would also, to some extent, depending on the particular case, be relevant to a relocation request:

The needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;

The interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;

Which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent;

The child's adjustment to the child's home, school, and community;

The mental and physical health of all individuals involved, including any history of abuse of any individuals involved.....;

Section 452.375.2. The first and third of the above-mentioned factors are virtually always pertinent and highly-weighted factors, in that it is the "declared public policy of this state that it is in the best interest of a child to have frequent, continuing, and meaningful contact with both parents" after a marital dissolution. *Lowery,* 287 S.W.3d at 697; Section 452.375.4.

Here, the trial court recited the fact that it considered this public policy and the 452.375 factors, among others, in arriving at its decision as to custody and relocation.

Jeremy challenges only the court's relocation decision and whether or not the evidence supported a finding that the proposed relocation would be in Sophia's best interest. We look at all the factors considered and addressed by the trial court as to that issue.

■ First, we note that the trial court did not separately discuss the factors considered as to the relocation request. Rather, the court discussed all the factors it regarded as relevant both to custody and relocation without separately discussing the two issues.[3] Nevertheless, that does not mean that the court did not understand that the two issues did not, either

---

**3.** While we know of no requirement that the court in its judgment must discuss separately the issues of custody and relocation, counsel might wish to consider asking the court to separately break out the reasons for the court's decision on relocation in findings of fact and conclusions of law. There will be overlap in the considerations applicable to both issues, but custody and relocation issues do not necessarily overlap.

logically or legally, have to be packaged together. Moreover, the court's considerations are sufficiently clear from the record and the judgment that it is not necessary to remand to the court in order to be able to perform our review of the relocation decision.

■ The trial court stated that it had considered the needs of the child for a frequent, continuing and meaningful relationship with both parents, and the ability and willingness of the parents to actively perform his or her parental function for the needs of the child. We assume, therefore, that the court appropriately placed a priority on making sure that both parents had reasonably convenient access to parenting time.

The trial court believed that Jeremy lacked a stable home environment. The court noted that he currently lives in Overland Park, Kansas, with his girlfriend. His girlfriend had by the time of trial obtained a divorce from her husband, but there was no discussion of a plan for Jeremy and his girlfriend to marry or to otherwise establish a permanent home together. On the occasions when he has Sophia in his care overnight, Jeremy exercises his parenting time at his parents' home in Independence. Jeremy has relied on his parents to help him in the exercise of his parenting time with his daughter. Jeremy admitted, for example, that while he was unemployed he would leave his parents' house around noon on most days—despite Sophia being there at the time—and go spend the afternoon with his girlfriend in Kansas. Thus, while this fact does not necessarily impugn Jeremy's ability to be a good father, the fact shows that the court had evidence that Jeremy has not always consistently availed himself of all opportunities to be with Sophia.

The court stated that it also considered Jeremy's "financial irresponsibility," noting that despite having the means to do so, he has paid no child support to Laura for the support of Sophia since the parties separated in late January 2009. The court may have considered the fact that if Jeremy is non-compliant with his duty to support his child, that fact may have made it more necessary for Laura to have more support from the resources of her family.

With regard to the child's adjustment to her home, school, and community, the court specifically considered the fact that Laura has been the child's primary caregiver. The court also, no doubt, considered the fact that Sophia had spent a significant amount of time with both sets of grandparents, and especially Jeremy's parents. The court stated that it also had considered the interactions and interrelationship of the child not only with parents, but also with all other persons who may significantly affect her best interests. The court also considered the physical and mental health of the individuals involved. Jeremy's parents were, according to Laura, "older," perhaps meaning older than *her* parents (though the record does not specify the ages), and Jeremy's parents are caring for Jeremy's elderly grandmother who resides with them, as well as taking care of Sophia when she is there. The evidence showed that neither Laura nor Jeremy had hindered the other in being able to spend parenting time with Sophia. The evidence also showed that Sophia had been able to spend significant time with both sets of grandparents. Sophia had also spent time in Kansas City with her cousin, the young child of Jeremy's sister, who resides not many miles from Blue Springs in Oak Grove.

In addressing Laura's proposal to relocate the principal residence of Sophia to Columbia, the court noted that Laura had grown up in Columbia and that she has significant family support there, including

her parents, brother, and numerous aunts, uncles, and cousins. The court observed that Laura has been employed by Shelter Insurance for thirteen years and that her employment will transfer to Columbia, the home office, which presented greater opportunity for advancement. The court considered Laura's intention to reside with her parents until her home in Blue Springs can be sold and she can acquire her own housing in Columbia. The trial court found that the parenting plan it adopted (which was essentially what Laura had proposed) provides for as much overnight parenting time for Jeremy as at the present time, but that the plan will need some modification when Sophia enters school in 2013. The court concluded that the "proposed move is made in good faith and would be in the best interest of the child."

The trial court heard testimony from both of the paternal grandparents and from the maternal grandfather. With regard to the child's interaction with parents, siblings, and others that may affect the child's best interests, the evidence showed that the grandparents on both sides were a positive influence, and that Laura had shown a willingness to allow abundant contact with not only Jeremy, but also with Jeremy's parents and his grandmother. If the relocation occurred, the trial court could have believed that Sophia would have a greater quantity of meaningful time with her maternal grandparents, aunts, uncles, and so on in Columbia, and still would be able to visit her paternal grandparents while in Jeremy's custody, while perhaps the amount of time visiting Jeremy's parents would be reduced somewhat.

Section 452.377.10(1) provides that if relocation is permitted, the court shall order sufficient contact with the non-relocating parent so as to "assure that the child has frequent, continuing and meaningful contact" with that parent. The parenting plan adopted by the court gives Jeremy time with Sophia every other Wednesday from 6:00 p.m. to Sunday at 6:00 p.m., which the court found was as much parenting time as he was scheduled for at the time of trial.[4] The relocation will likely mean that it will not be as convenient for Jeremy to utilize his opportunities for "frequent, continuing, and meaningful contact" with Sophia. Certainly, having Sophia in Columbia, and transferring Sophia at a mid-point such as Sweet Springs (as provided in the parenting plan), is inconvenient for all, especially for Jeremy, and this was properly considered by the trial court. The trade-off as to Jeremy's additional inconvenience, however, was the greater convenience for Laura, whose round-trip driving time between Blue Springs and Columbia to spend time with her family would be reduced.

Laura's intention to relocate the child's principal residence was driven largely by Laura's own best interests, but that does not mean the court could not also find that there would be a benefit to Sophia. Despite Jeremy's argument, we know of no statutory directive or hard-and-fast judicial rule (as discussed below) that there must be specific evidence detailing exactly how the relocation would directly benefit the child, as distinct from benefiting the parent desiring to relocate. While we agree with Jeremy that the relocation decision is much more about the welfare of the child than it is about the rights of the parents to follow their own desires and ambitions, often there will be some significant overlap.

Laura grew up in Columbia, and her family support is in and around Columbia. Her job of thirteen years at Shelter Insur-

---

4.   We presume that the trial court included the additional time Jeremy would have Sophia on holidays and in the summer (two non-consecutive seven-day periods) in this calculation.

ance will transfer to the company's home office in Columbia, providing more opportunity for advancement. The evidence was also consistent with the notion that allowing relocation to Columbia would not essentially change the relationships which were in Sophia's best interests.

The trial judge could reasonably infer in this case that what helps Laura in terms of family support and career advancement will also provide benefits for Sophia. The trial court was aware that as the result of a move, Sophia will have more regular contact with her Columbia grandparents, though that may, to some extent, diminish the amount of time she would otherwise have had with her Independence grandparents. A move to Columbia would mean that Sophia could have contact with cousins, aunts, and uncles there, but at the same time, Sophia may enjoy less time with her cousin in Oak Grove. As far as Sophia's school, there was testimony that the schools in both Blue Springs and Columbia are relatively good.

■ While each request for relocation must be determined based on its own "unique and particular facts," *Mantonya*, 311 S.W.3d at 402, we do not ignore cases that may present somewhat similar fact patterns. In *SEP v. Petry*, 35 S.W.3d 862, 869 (Mo.App.2001), the court allowed a relocation for reasons that included better employment and financial betterment for the relocating parent. In *Petry*, as here, the evidence of how the move would be in the best interest of the child was mainly indirect. *Id.* at 867–68. The appellate court nevertheless upheld the move which, in that case, was out of state.[5] *Id.* at 869. Also, this court in *Murray v. Murray*, 318 S.W.3d 149, 155 (Mo.App.2010), affirmed a

grant of a request to relocate. There, the trial court found that the mother's proposed parenting plan was more specific about how the move would benefit her daughter, while the father's proposed plan, while also reasonable, was more indefinite. *Id.* The court also found it significant that, as in this case, the father would have approximately the same number of days with daughter in his physical custody as he previously had enjoyed and, thus, would still have frequent, continuing and meaningful contact. *Id.*

Jeremy says the facts in this case are similar to *Lowery*, 287 S.W.3d 693, in which the Eastern District of this court *reversed* a trial court decision to allow an out-of-state relocation to Florida as not in the child's best interest. There, the custodial parent did not present any evidence about the child's future living environment nor demonstrate that she had made any plans for housing or employment, and so forth. *Id.* at 698. That, in the context of a request involving a move from Missouri to Florida, with the out-of-state travel that would have been involved, persuaded the court that the move was not in the child's best interest. *Id.* This case differs from *Lowery*, however. Here, Laura demonstrated that she had a plan for Sophia's living arrangements and for her own employment, her plans were confirmed by her father's testimony, and the move was a drive of a couple of hours rather than a plane flight to Florida.

"A good living environment and a stable home are primary considerations in determining a child's best interest," said the court in *Lowery*, 287 S.W.3d at 696. The trial court here found that Jeremy lacked a stable home environment because he

---

**5.** The court in *Petry* employed the *Michel* four-factor best interest test, which was overruled in *Stowe*, 41 S.W.3d at 469; however, the consideration of such factors still would be consistent with an analysis that requires the trial court to consider "all relevant factors."

lives part-time with his girlfriend in Kansas and stays with his parents in Independence when he has overnights with Sophia. There was no specific evidence that he planned to change those arrangements. While this may have been primarily relevant to the custody decision, no doubt the court considered these arrangements in connection with the relocation decision also.

An important factor to consider in a relocation case is the time and expense involved in transporting the child between the parents' homes. Pursuant to section 452.377.10(2), where relocation is permitted, "[t]he court shall specify how the transportation costs will be allocated between the parties." Here, the parenting plan takes into account the expense of the highway driving and provides for it to be shared by the parties by having a mid-way point for transfer.

There is a point, when one parent is seeking to move away for a *somewhat* better situation, where the distance and travel inconvenience to the other parent (or perhaps the inconvenience to the child) is simply too great to warrant allowing the move. This case involves over two hours of driving time to unite parent with child. Such is not to be taken lightly. Trial courts could easily differ with one another as to whether to allow a move in this case. Here, while the travel distance is substantial, and the highway travel is inconvenient, it appears (due to the fact that Laura has regularly traveled to her parents' house on alternate weekends) that *Sophia* is going to be subjected to significant highway travel regardless of whether the relocation is granted.

While not all would necessarily be persuaded that the court should have granted Laura's relocation request, we defer to the trial court's decision in such cases "even if the evidence could support a different conclusion." *See Foster v. Foster*, 149 S.W.3d 575, 579 (Mo.App.2004). "The deference we afford trial court judgments in relocation matters reflects the trial court's superior position to evaluate the facts in each case, and to assess, based on those unique facts, the best interest of the child[ ]." *Mantonya*, 311 S.W.3d at 402.

While, as a general rule, it is *significantly* more desirable to have both parents in the same community in a joint physical custody arrangement, we cannot say that in this case we are "firmly convinced that the child's welfare requires some other disposition." *See Lowery*, 287 S.W.3d at 694. Point denied.

### Conclusion

The judgment is affirmed.

All concur.